## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

KATRINA M. EVANS,              )
                              )
      Plaintiff,              )
                              )
v.                            )    CIVIL NO.  1:17cv54
                              )
NANCY A. BERRYHILL, Acting     )
Commissioner of Social Security, )
                              )
      Defendant.              )

## OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Disability Insurance Benefits (DIB) as provided for in the Social Security Act.  42 U.S.C. §416(I).  Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based.  The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of no less than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act

through December 31, 2018 (Ex 5D).

2.     The claimant has not engaged in disqualifying work activity since April 4, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.     The claimant has the following severe impairments: disorders of the lumbar spine (degenerative changes at multiple levels, status post L4-5 discectomy in 2006, and L4-5 decompression and fusion in 2013), right hip bursitis, and obesity (20 CFR 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she can sit for 45 minutes at a time, stand for 30 minutes at a time, and walk no more than 1 block at a time. In addition, she can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, she can never climb ladders, ropes or scaffolds, she can never operate foot controls with her right lower extremity, and she must avoid concentrated exposure to wetness, vibrations, and hazards, such as slippery, wet, moving, or uneven surfaces.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on June 21, 1973 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Her age category has not changed as of the date of this decision (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 92-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act,

from April 4, 2013, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 21- 29)

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on July 3, 2017. On July 27, 2017, the defendant filed a memorandum in support of the Commissioner's decision, and on August 28, 2017, Plaintiff filed her reply. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Plaintiff filed her application for disability benefits on August 8, 2013, alleging disability beginning April 4, 2013. (Tr. 192-198). On behalf of SSA, the state disability determination service denied Plaintiff's application initially on November 19, 2013, and upon reconsideration on March 6, 2014. (Tr. 129-137, 139-145). In response to a timely-filed request, SSA ALJ Stephanie Katich held a hearing on July 1, 2015. Plaintiff, her husband, Michael Evans, and a vocational expert, Robert Barkhaus, appeared and testified at the hearing. (Tr. 37). Plaintiff was represented at the hearing by attorney Ann Trzynka. (Tr. 37). On August 19, 2015, ALJ Katich issued a decision finding that Plaintiff was not disabled as defined in the Social Security Act. (Tr. 16-36). Plaintiff asked SSA's Appeals Council to review the decision, and on December 13, 2016, the Appeals Council denied her request. (Tr. 1-7, 13-15). Plaintiff timely filed her complaint in this Court pursuant to 42 U.S.C. § 405(g).

Plaintiff was 39 years old and considered a "younger person" as of April 4, 2013, the date she alleged her disability began. (Tr. 102). She has an associate's and a bachelor's degree in nursing. (Tr. 52, 242). Plaintiff's past relevant work was comprised of several jobs in nursing field, generally performed at the light and medium exertional levels. (Tr. 82-83). Plaintiff worked after April 2013, but her work activity was not disqualifying substantial gainful activity (Tr. 21).

Plaintiff and her husband testified at the administrative hearing. (Tr. 42-78). Plaintiff confirmed that she has had two surgeries on her lumbar spine; one in 2006 and another in the fall of 2013. (Tr. 44). She testified that she worked with back pain for many years as a nurse and for the most part had been on pain medications, including Ultram, Vicodin, and Percocet. (Tr. 49). She developed a severe, unusual pain in April 2013 after moving boxes in her basement. (Tr. 49). Plaintiff described her pain as very sharp pain from her SI joints, which rotated from left to the

right, and continuing low back pain with a pinching or pulling sensation often going down either the right or left side with pain. (Tr. 46-47). Sitting too long caused her legs and part of her buttocks to go numb, walking less than a block caused her right leg to get weak, and standing a half-hour was her limit. (Tr. 47-48). She reported seeing Dr. Reecer every two to three months regarding SI joint dysfunction and low back pain. (Tr. 46).

Plaintiff testified that she finished her bachelor's degree in July 2014 through an online program at Indiana Wesleyan. (Tr. 52). It took her three years to finish a fifteen month program because she took several leaves of absences and was struggling to sit long enough to write papers or do her course work. (Tr. 52, 68). Her school work took about twelve to fifteen hours per week, and she took considerably longer to do the assignments and quite a few were turned in late because of needing increased time to sit and stand and move around. (Tr. 68). She returned to get her bachelor's degree because her back was getting bad, and her goal was to get a full-time director of nursing position or some other position that did not require lifting. (Tr. 99). She noted, however, that she couldn't sit long enough to achieve her goals. (*Id.*).

Plaintiff also testified concerning work activity performed after her alleged disability onset date. She began working two to three days a week doing vision screenings for non-public schools in August 2014 and wanted to see if she could adjust to that type of work. However, going up and down stairs, carrying the equipment, and sitting and twisting caused her to be in pain. (Tr. 56-57, 59). She resigned in February 2015 and had no plan to return to that job. (Tr. 59). Plaintiff started a job as a nurse recruiter on December 18, 2014, and noted that the position involved a lot of desk sitting with some duties that could be done standing if needed. (Tr. 57-58). She worked between ten to fifteen hours per week as a nurse recruiter and usually worked four to five hours at a time.

(*Id.*). If she was having a rough day with more pain, she could work two to three hours and make up the time on another day. (Tr. 58). Plaintiff tried to increase her hours as a nurse recruiter for about two and a half months and worked 28 or 29 hours a week, but by the time she got home, she was mostly lying flat on the couch or with a heating pad or ice pack, and the next day was even more painful. (*Id.*). She testified that working or six or seven hours, even with the switching positions, was a lot more painful than working four to five hours. (Tr. 69). In addition to taking pain medications, Plaintiff occasionally used a TENS unit, but she noted that the pain would come flooding back after the electrical stimulation was gone. (Tr. 69). She noted that bending and holding something or trying to pick something up aggravated the pain as did damp and rainy weather or cold weather. (Tr. 70).

Plaintiff and her husband also testified regarding daily living activities and reported that their children, ages 12 and 15, did many of the household chores, including laundry, dishes, and yard work. (Tr. 75-76). Plaintiff discussed a camping trip she went on with her Boy Scouts in July 2014, and noted that she fell twice and had not been camping since. Plaintiff's husband clarified during his testimony that a golf cart drove Plaintiff to the camp site and that their son set up the tent so Plaintiff was not required to bend. (Tr. 72-73, 75). Plaintiff reported that she continued to attend Boy Scout meetings with her son, but she was no longer a leader. (Tr. 73).

Plaintiff initially presented to Mark Reecer, M.D. in September 2005 at which time he diagnosed lumbar pain syndrome. (Tr. 806). Her course of treatment included pain medications, multiple injections, and referrals for physical therapy and surgical consultations. (Tr. 393-394, 543-550, 619-623, 702-731, 746-809). In January 2006, a MRI in showed a large disc herniation or extrusion at L4-5 encroaching on the nerve roots and causing lateral recess stenosis, Dr. Reecer

also referred Plaintiff to Dr. Rahn for a surgical consultation. (Tr. 744-745, 794-795). During the period from 2008 to 2011, Plaintiff continued to see Dr. Reecer as needed for flares of her lower back and hip pain (Tr. 788-789). In December 2012, she returned and reported that she had been doing well on her medications, but she had experienced an increase in her pain after a job change which required her to lift approximately 75-80 pounds to transfer a patient and also after falling in her garage after tripping on her right foot. (Tr. 756). She returned in March and April 2013 and was given a pain medications refill and a referral for physical therapy. (Tr. 751-753). In April 2013, Dr. Reecer provided an off work note, and in May 2013, he noted that Plaintiff was not back to work. (Tr. 749, 752). In July 2013, Plaintiff returned to the doctor with pain in the low back, the trochanteric region, and right anterior thigh. (Tr. 427). She was seeing her physical therapist, Doug, intermittently with some temporary, but not long-term benefit. (Tr.413). At the July 2013 visit, Dr. Reecer administered an injection in the right trochanteric bursa, prescribed a wheelchair, and issued permanent work restrictions. (Tr. 427). In August 2013, Dr. Reecer performed diagnostic facet injection and referred Plaintiff back to Dr. Rahn for another surgical consultation the same month. (Tr. 393-394, 507).

Plaintiff continued to receive pain management treatment with Dr. Reecer after her September 2013 lumbar surgery and had ongoing back and leg pain, right trochanter bursitis, and SI joint dysfunction. (Tr.543-550, 619-623, 702-731). In August 2014, Plaintiff left a message for Dr. Reecer's office reporting increased pain in her back described as pinching and switching from side to side. (Tr. 727). She was also getting numbness more consistently into her legs when she sitting for longer than 15-20 minutes and some numbness in her right arm when she is on the computer. (*Id.*). Dr. Reecer ordered a lumbar MRI which was completed in August 2014 and

indicated moderate to slightly advanced L3-L4, mild to moderate L5-S1 degenerative facet arthroplasty, and mild L1-L2 degenerative disc disease with anterior superior endplate L2 Schmorl's nodule. (Tr. 724-725). Later the same month she reported that she had an increase in pain after falling and had worked in the morning for about 2.5 hours and came home and took two Norco and a Flexeril and felt somewhat better. (Tr. 723). The following day Plaintiff reported her SI joint pain was worse, and she was having increased right shoulder pain and muscle spasms in her fingers. (Tr. 722). An EMG from September 2014 showed mild bilateral carpal tunnel syndrome. (Tr. 715). Dr. Reecer continued to prescribe Percocet for pain control. (Tr. 708-714). As of June 2015, Dr. Reecer indicated that Plaintiff's permanent work restrictions included no bending or twisting, no squatting, no climbing, alternate sitting and standing, no lifting over ten pounds, and no reaching or overhead lifting. (Tr. 978-979).

In August 2013, Kevin Rahn, M.D. evaluated Plaintiff regarding increasing back pain with leg pain. (Tr. 505-506). He noted that Plaintiff had a disc excision in 2006, and that he last saw her in 2008; however, she was getting much worse recently. He reviewed lumbar spine x-rays and indicated that Plaintiff had recurrent stenosis, disc herniation, and retrolisthesis at L4 and L5. (Tr. 505). He recommended another lumbar spine surgery and indicated that Plaintiff would have a one in four chance of having no relief or getting worse and a 50-50 chance of having significant relief. (Tr. 506).

In September 2013, Plaintiff underwent another surgery on her lumbar spine, a laminectomy decompression at L4 and L5, a transforaminal interbody fusion, anterior titanium spacer, instrumentation at L4-5, and autograft. (Tr. 502-503). At an October 2013 follow-up visit, Plaintiff was using a cane for stability and reported an achy/weakness in the right leg to the foot,

left buttocks hyperesthesia, and bladder numbness that started after the surgery. (Tr. 498). In December 2013, Dr. Rahn indicated that Plaintiff was released to return to work with permanent restrictions of no bending, twisting, or stretching, no lifting over ten pounds with the bilateral upper extremities, and must alternate between sitting and standing as tolerated. (Tr. 554, 581). At visit in January 2014, she still had intermittent pain in the right leg, which had increased over the previous week, along with back pain and numbness in the left buttocks with hyperesthesia. (Tr. 579-580). In March 2014, Plaintiff was seen for a bone health evaluation because Dr. Rahn reportedly found during surgery that Plaintiff had poor bone quality. (Tr. 975). Diagnostic impressions were vitamin D deficiency, osteopenia, and intestinal malabsorption. (Tr. 975).

Patrick Holly, M.D. was Plaintiff's long-time primary care physician, and his records document Plaintiff's difficulties related to lower back pain beginning at least March 2000 (941-942). Through the years, she had progressive worsening, and Dr. Holly referred Plaintiff to Dr. Reecer as well as other specialist physicians. (Tr. 867, 871-874, 899, 902, 923, 932-936, 941-942). Dr. Holly also diagnosed and prescribed medication to treat anxiety with sleep difficulties and depression. (Tr. 867, 879-880, 901, 928-931). Dr. Holly's records also reflect that Plaintiff was obese with a body mass index (BMI) at 35.74 in August 2013 and 37.62 in December 2001. (Tr. 568, 658).

Plaintiff participated in physical therapy at Mallers & Swoverland prior to and subsequent to her September 2014 surgery. (Exhibit 7F, 22F). Between April and August 2013, she participated in 24 sessions and had a favorable response but with frequent exacerbations and underlying lumbar instability with poor neuromuscular support. (Tr. 396). Between November 4, 2013 and January 8, 2014, Plaintiff participated in eight additional sessions with therapy, and

although she reported overall improvement in pain and function, she was still quite limited with standing and walking to only a few minutes at a time. (Tr. 601).

Plaintiff started treating with psychiatrist Prevesh Rustagi, M.D. in approximately November 2007, and she had regular visits for medication management for conditions including bipolar disorder and organic sleep apnea. (Tr. 387-388, 519-539, 611-618, 624-643). In July 2013, Plaintiff reported that her mood felt "off" and that she had been much more impulsive and had been crying a lot. (Tr. 522). At an appointment in October 2013, Dr. Rustagi noted that high dose of Seroquel worked well as a mood stabilizer, but Plaintiff had been preoccupied with her orthopedic issues and remained out of work with a poor prognosis for return to work. (Tr. 520). In March 2014, Dr. Rustagi noted that Plaintiff's sleep apnea was poorly controlled, her mood was up and down, and she appeared overwhelmed with a sad affect. (Tr. 639-640).

In April and May of 2014, Dr. Rustagi made adjustments to Plaintiff's medications and noted that Plaintiff's new CPAP machine had helped and that her chronic low back and sacroiliac pain continued to disable her. (Tr. 635-638). In September 2014, Dr. Rustagi noted that situational factors make it difficult to determine the effectiveness of medications, and he adjusted Plaintiff's Seroquel and referred her for psychotherapy. (Tr. 631-632). In January and April 2015, Dr. Rustagi noted that Plaintiff showed improvement with her mood disorder reasonably well-controlled by medications without significant side effects. (Tr. 625-628).

In January 2004 Plaintiff underwent a sleep study, and Dr. Thomandram Sekar, MD diagnosed sleep apnea. (Tr. 832). In July 2005, Dr. Sekar's impressions were obstructive sleep apnea and narcolepsy. (Tr. 835). In December 2013, Plaintiff transferred care to another physician, Srinivasan Devanathan, MD, for her obstructive sleep apnea. (Tr. 557). She noted that

her CPAP usage had been limited by pain. (*Id.*). A repeat sleep study from December 2013 indicated mild sleep apnea. (Tr. 569-572). At a follow-up appointment in January 2014, Dr. Devanathan indicated that the sleep apnea needed to be treated given the additional diagnosis of bipolar disorder. (Tr. 564-568). Dr. Devanthan also indicated that she could stay on the medication, Provigil at 200mg per day due to hypersomnia. (Tr. 565). In March 2015, Dr. Devanathan reported that Plaintiff's sleep apnea was well-controlled on present CPAP settings and that her idiopathic hypersomnia were controlled with medication if she obtained adequate sleep, but that her multiple mood stabilizing drugs were affecting her overall sense of sleepiness. (Tr. 697-700).

On November 19, 2013, M. Ruiz, M.D., a non-examining physician, evaluated Plaintiff's claim on behalf of the Indiana Disability Determination Bureau (DDB). In November 2013, Dr. Ruiz indicated that Plaintiff's medically determinable impairments could be reasonably be expected to produce her pain and other symptoms, and that statements about the intensity, persistence, and functionally limiting effects of the symptoms substantiated by the objective medical evidence alone. (Tr. 107). In assessing her physical residual functional capacity (RFC), Dr. Ruiz determined that Plaintiff could do light work involving lifting up to twenty pounds occasionally, ten pounds frequently, sitting six out of eight hours and standing and/or walking six out of eight hours. He also found that Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl with and environmental limitation of avoid concentrated exposure to wetness, vibration, and hazards such as slippery, wet, moving, and uneven surfaces. (Tr. 107-109).

On March 5, 2014, another non-examining state agency reviewer, Joshua Eskonen, D.O.

completed a physical RFC assessment upon reconsideration. He affirmed the prior RFC assessment from Dr. Ruiz. (Tr. 120-123). Dr. Eskonen concluded that Plaintiff's statements concerning her symptoms were not substantiated by the medical evidence alone and that her "allegations, statements, and symptoms" were "partially credible." At the reconsideration level, Dr. Rahn's medical opinion from December 12, 2013, was included in the record, and Dr. Eskonen indicated that "controlling weight" was given Dr. Rahn's opinion. (Tr. 121).

The Psychiatric Review Technique forms submitted by state agency psychologists in November 2013 and March 2014 found that Plaintiff had a non-severe psychiatric impairment resulting in mild restriction of activities of daily living and mild difficulties with social functioning and concentration, persistence or pace. (Tr. 106-107, 118-120).

In support of remand, Plaintiff first argues that the ALJ failed to properly weigh the opinion evidence. A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and is not inconsistent with other substantial evidence in the record. *Clifford*, 227 F.3d at 870. *See also* 20 CFR §404.152; Social Security Ruling 96-2p.4 The ALJ must consider a variety of factors, including whether a physician is a treating or examining physician; the length, nature, and extent of the treatment relationship; the physician's specialty; and the consistency and supportability of the physician's opinion. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996). *See also* 20 CFR § 404.1527. The ALJ must always explain and give good reasons for the weight given the opinion of the treating source, and he must not substitute his own judgment for the physician's opinion without relying on other medical evidence or authority in the record. *Clifford, Id*; *See also* CFR § 404.1527. Consistent with the Commissioner's regulations, the Seventh Circuit has ruled that a

treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. *See Campbell v. Astrue*, 627 F.3d 299, 305-06 (7th Cir. 2010).

In evaluating the opinions from Dr. Rahn and Dr. Reecer, the ALJ noted that they both opined that Plaintiff should not lift over ten pounds or do any bending or twisting. She noted that Dr. Rahn also opined that Plaintiff should not do any stretching, and Dr. Reecer indicated she should do no squatting, climbing, or reaching. The ALJ rejected all of the opinions and gave them "little weight" because they were allegedly "extreme limitations" and "not consistent with the claimant's current work activity, her activity of daily living, or the medical evidence." (Tr. 27) Plaintiff argues that the reasons the ALJ offers are not "good reasons," and that the ALJ has failed to provide facts and rational supporting her assertion of inconsistency.

Plaintiff contends that the evidence of Plaintiff's work activity does not detract from the opinions. In August 2014, after being off work for nearly a year, Plaintiff accepted a job as a hearing and vision screener working two days a week in non-public schools. On February 20, 2015, Plaintiff tendered a resignation letter wherein she indicated that she had two falls unrelated to her work and reported that the job duties increased her pain significantly. (Tr. 322). At the hearing, Plaintiff elaborated that activities of the position, including going up and down stairs, carrying equipment, and twisting in a chair to do near vision screening, were activities that caused pain. (Tr. 59). In December 2014, Plaintiff accepted a job as a nurse recruiter, which was not physically demanding and was done mostly sitting with some standing as needed. (Tr. 58). Melanie Rey, R.N., who hired Plaintiff for the nurse recruiter position, described the duties of the position and her observations regarding Plaintiff's  pain and limitations and noted that Plaintiff needed to rearrange her schedule, at times coming in later or leaving early due to pain, and that

she the needed to alternate positions from desk chair to an exercise ball chair to working at a higher counter area while standing. (Tr. 317). Even with the flexibility, Ms. Rey noted that Plaintiff experienced a marked increase in pain levels after working longer than five to six hours per day. (Tr. 317-318).

Plaintiff further notes, with regard to activities of daily living, that the ALJ indicated that Plaintiff was able to engage in a "rather full range of activities," including attending Boy Scout meetings with her son, camping for Boy Scouts as late as the summer of 2014, sorting laundry, helping her children with their homework, taking her medications without reminders, preparing simple foods, driving, going out alone, paying bills, shopping for groceries, going to the library, counting change, handling bank accounts, reading for pleasure, going to church, using a telephone, and watching television. (Tr. 26). Plaintiff points out that the ALJ did not explain in what manner the activities are inconsistent with the opinions of her treating doctor. Plaintiff argues that a review of Plaintiff's activities of daily living is consistent with the restrictions. Plaintiff has required her children's help with carrying grocery bags and laundry baskets, and with transferring the laundry from the washer to the dryer. Her cooking is limited due not only to difficulty standing, but also due to her inability to move the bigger pans and lean over to use the oven. (Tr. 278-285, 290-295). Plaintiff also reported that there are many household chores she does not do because of the increase in pain, including vacuuming, mowing the yard, mopping floors, cleaning the toilet/shower, and changing bed sheets. Plaintiff and her husband both reported that she needed assistance shaving her lower legs, and occasionally with dressing the lower part of her body, and drying her lower legs. (Tr. 279, 289). With regard to camping, Plaintiff reported that she went camping on one occasion after her September 2013 surgery and

15

that was the last camping trip she went on because she fell twice. (Tr. 53-54, 72-73). Her husband added that Plaintiff was picked up in a golf cart and she was not required to do any bending or lifting. (Tr.75).

Plaintiff also argues that the ALJ has not identified what medical evidence is inconsistent with the limitations. Plaintiff acknowledges that the state agency opinions differed from the treating source opinions, but argues that the opinions from non-examining state agency physicians do not by themselves suffice as substantial evidence to reject an examining physician opinion. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). In fact, Dr. Rahn's opinion from December 2013 was available at the reconsideration level of review, and state agency physician Dr. Eskonen indicated that the opinion was entitled to "controlling weight." (Tr. 121).

Plaintiff further points out that she also has a long history of progressively worsening medical problems and has undergone extensive treatment including many sessions of physical therapy, bariatric surgery, and two spinal surgeries with Dr. Rahn. She has participated in pain management with Dr. Reecer since 2005. (Tr. 806). Plaintiff claims that her spinal surgeries, SI joint dysfunction, and right hip bursitis along with her obesity are reasonable and consistent with the limitations expressed by Dr. Rahn and Dr. Reecer. Plaintiff states that compounding the ALJ's errors in weighing the medical opinion evidence is her failure to properly consider the medical significance of Plaintiff's SI joint dysfunction on her ability to function. Dr. Reecer's opinion in July 2013 concerning Plaintiff's work restrictions is accompanied by a letter from his office from the same date explaining that Plaintiff suffers from chronic SI joint pain and instability treated with therapy and multiple injections providing only temporary relief. (Tr. 971). Dr. Reecer prescribed a wheelchair at that time due to the chronic SI joint dysfunction. (Tr. 973). Plaintiff

contends that the ALJ underestimated the significance of the SI dysfunction inasmuch as she did not find the condition to be a severe impairment, and her "evaluation" of the condition consisted of mentioning "sacroiliac joints" twice in the decision —once in a summary of Plaintiff's medical treatment history and again in summarizing her testimony. (Tr. 22, 26).

The ALJ indicated that she gave "some weight" to the part of the opinions of Dr. Rahn and Dr. Reecer indicating that Plaintiff needs to alternate between sitting and standing and also to the state agency physicians' opinion that Plaintiff is able to perform a limited range of light work. (Tr. 27). The ALJ concluded that "Ms. Evans should avoid heavier lifting and/or carrying, as well as prolonged standing, sitting and walking, along with the several other postural and environmental limitations" and she found that those limitations are "reasonable, in light of the claimant's lumbar surgical history, right hip bursitis and obesity." (Tr. 27-28).

Plaintiff points out that, in determining what limitations were "reasonable," the ALJ neglected to mention Plaintiff's SI joint dysfunction. She also failed to give sufficient consideration and weight to the opinion of Dr. Rahn that sitting and standing were "as tolerated." (Tr. 554). As "tolerated" per Plaintiff included the ability to stand for up to 30 minutes and sit for 45 minutes to an hour before needing to walk around or switch chairs. She further indicated that she could do this for a period of four to five hours without having a significant increase in pain, which is corroborated by a letter from Plaintiff's supervisor, Melanie Rey. (Tr. 68). Although the ALJ's RFC finding included the ability to sit for 45 minutes at a time, stand for 30 minutes at a time, and walk no more than a block, it failed to incorporate the need to walk around and switch chairs every hour. The evidence demonstrated that Plaintiff could sustain these work activities for only a period of to four to five hours before experiencing a significant increase in her pain. (Tr.

25). Additionally, even if there were "inconsistencies" weighing against the opinions, the ALJ was required to consider the factors set forth in 20 C.F.R. § 404.1527(c) in determining the weight to be given to the opinions: the length, nature and extent of the treatment relationship, the supportability of the opinion by medical evidence, the consistency of the opinion with the record as a whole, and whether the medical source is a specialist. *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014). Plaintiff argues that in the present case, the ALJ did not address the length, nature, or extent of Plaintiff's treatment relationship with Dr. Rahn and Dr. Reecer in weighing their opinions. The ALJ also incorrectly stated that Dr. Rahn and Dr. Reecer were both "physiatrists"; however, Dr. Rahn is an orthopedic surgeon, and Dr. Reecer is also double board certified in physical medicine and rehabilitation, and pain management. (Tr. 27, 438, 384, 978). Plaintiff further argues that the ALJ has failed to appropriately factor in the supportability of the opinions - she failed to mention Plaintiff's SI joint dysfunction, which is the medical condition Dr. Reecer identified in support of his opinions and work restriction in June 2015. (Tr. 978-979).

The ALJ also chose to give "some weight" to the state agency opinions for light work. Plaintiff contends that the state agency opinions are internally inconsistent in multiple respects reducing their probative value. As discussed above, Dr. Eskonen gave "controlling weight" to the medical opinions of Dr. Rahn, yet Dr. Eskonen's RFC failed to include the work restriction that Dr. Rahn assessed. (Tr. 116, 121-123). The state agency physicians also found that Plaintiff could climb ladders, ropes and scaffolds, yet determined she needed to avoid hazards such as slippery and uneven surfaces. (Tr. 108-109, 122-123). The ALJ did not explain or even acknowledge the inconsistencies. As with her weighing of the treating source opinions, the ALJ assigned weight to the state agency opinions without discussing the required factors. *See e.g., Steele v. Barnhart*, 290

F.3d 936, 940 (7th Cir. 2002).

Rather, the ALJ cobbled together portions of internally inconsistent state agency opinions and impermissibly relied on her own lay intuition concerning Plaintiff's "reasonable" limitations in formulated the RFC finding. *See Rohan v. Chater*, 98 F.3d 966, 970-971 (7th Cir. 1996) (ALJs are legal professionals, not doctors). Further, the ALJ failed to consider one of Plaintiff's most painful impairments--her SI joint dysfunction—in assessing what limitations were "reasonable." Thus, Plaintiff concludes that the ALJ's analysis is not sufficient to satisfy the Commissioner's own rules regarding treating source evidence and falls far short of building the "logical bridge" required by the Seventh Circuit. *See Schmidt v. Barnhart*, 395 F .3d 737, 744 (7th Cir. 2005).

Plaintiff suggests that, had the ALJ undertaken the proper evaluation and afforded appropriate weight to the medical opinions of Dr. Rahn and Dr. Reecer, she would have formulated an RFC finding reflective of Plaintiff's actual work related abilities. This would have in turn resulted in a finding of disability at step five of the sequential evaluation based on the testimony the VE. The VE testified that he did not know of any jobs that do not require at least occasional bending, twisting, or stretching, and the limitations would exclude "pretty much all work." (Tr. 90). He also indicated that the ability to sit and stand at will in unskilled work is usually not acceptable. (Tr. 91). The ALJ also confirmed that the ability to work five or six out of eight hours would also be work preclusive. (Tr. 97).

The Commissioner defends the ALJ's rejection of the opinions of Drs. Rahn and Reecer because the ALJ allegedly considered medical evidence inconsistent with the opinions, e.g., muscle strength was generally graded at no worse than four out of five, she had no muscle atrophy or reflex deficits, and an EMG of the right leg was negative in December 2012. Plaintiff,

however, argues that the evidence cited is not necessarily inconsistent with Drs. Rahn and Reecer's work restrictions of no lifting over 10 pounds and no bending or twisting; Dr. Rahn's opinion of no stretching; and Dr. Reecer's opinion for no squatting, climbing, or reaching. (Tr. 554, 581, 972).

Plaintiff also contends that there is no assurance that the ALJ appreciated the severity or considered Plaintiff's sacroiliac (SI) joint dysfunction in evaluating the opinions because she failed to evaluate the severity of the condition at Step 2, an admitted error, which is not harmless. Defendant's Brief pp. 6-7. Plaintiff points out that the medical evidence does demonstrate diminished reflexes, e.g., absent S1-Achilles reflex (right) and reflexes diminished to +1 at L3-Patellar (right) and at the knees and ankles. (Tr. 609, 753, 763, 789). This court agrees with Plaintiff that not only has the ALJ failed to fully and fairly evaluate the medical evidence, but she has also failed to logically connect the medical findings to her conclusion that the opinions are entitled to "little weight." *See e.g., Craft v. Astrue*, 539 F.3d 668, 677-678 (7th Cir. 2008) (An ALJ must create an accurate and logical bridge between the evidence, including the recitation of the medical evidence, and conclusions.).

The Commissioner also relies on the harmless error doctrine to defend the ALJ's error in citing daily living activities and work activity as evidence to reject the medical opinions. Defendant's Brief p. 5. The Commissioner concedes error with regard to two out of three of the reasons the ALJ offered for rejecting the opinion evidence, yet asserts that "the Court can be assured that the result would have been the same because the ALJ considered Plaintiff's treatment evidence in the evaluation of Drs. Rahn and Reecer's opinions." Defendant's Brief p. 5. However, aside from the shaky basis for this assertion, Plaintiff has adequately shown that the ALJ's

evaluation of the treatment evidence is not sufficient to reject the opinions.

The Commissioner also concedes that the ALJ failed to apply the checklist factors enumerated in 20 C.F.R. § 404.1527(c) in evaluating Dr. Rahn and Dr. Reecer's opinions. Defendant's Brief p. 6. Essentially, the Commissioner argues that the ALJ only needed to consider the "consistency factor" and could properly ignore the other factors. Clearly, however, this argument is not consistent with the plain language of the statute or 7th Circuit case law. *See e.g. Moss v. Astrue*, 555F. 3d 554, 561, (7th Cir 2009) ("If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion."). In the present case, the ALJ failed to consider factors, including the length, nature, and extent of the treatment relationship, frequency of examination, physician specialty, and supportability, all of which weigh in favor the opinions. Moreover, the ALJ's consideration of the "consistency factor" was also flawed as discussed above.

With regard to the state agency opinions, the Commissioner asserts that the ALJ properly weighed the opinions. Defendant's Brief pp. 8-9. Although the ALJ generically assigned "some weight" to the opinions, her evaluation falls short of what is required by 20 C.F.R. § 404.1527. The error is particularly harmful because state agency medical consultant, Dr. Eskonen, indicated that Dr. Rahn's opinion was entitled to "controlling weight," yet the ALJ failed even acknowledge this opinion let alone explain why she implicitly rejected it. (Tr. 16-36, 116, 121). The Commissioner asserts that the weighing of the state agency opinions was supported because the ALJ properly considered Dr. Rahn's opinion and gave it "little weight." Defendant's Brief p.

9. The Commissioner has employed faulty, circular reasoning to defend the ALJ's flawed weighing of the opinion evidence. She has started with the flawed assumption that Dr. Rahn's opinion is not supported by the medical evidence and on that basis defended the implicit rejection of Dr. Eskonen's opinion that Dr. Rahn's opinions was entitled to controlling weight. Considering all the errors in the ALJ's evaluation of opinion evidence, remand is necessary.

The Commissioner contends that ALJ properly considered and weighed the opinion that Plaintiff's required an option to sit or stand "as tolerated" by including in the RFC that she could sit for forty-five minutes at a time and stand for 30 minutes at time. Defendant's Brief pp. 5-6. However, due to the errors in evaluating the evidence and credibility, the RFC finding did not adequately account for Plaintiff's limited tolerance for sitting and standing. This necessarily implicates the credibility of Plaintiff's subjective complaints and will now be addressed in greater detail.

With respect to credibility, Plaintiff argues that the ALJ improperly discounted her symptom testimony. The ALJ concluded that "the claimant's testimony of pain, other symptoms and functional limitations, when compared against the objective evidence and evaluated using factors in SSR 96-7p5, was not fully credible in view of the general lack of significant clinical findings, the claimant's work activity after April 2013, her pursuit of higher education while working part-time during the relevant period, and her demonstrated ability to engage in a wide range of activities of daily living." (Tr. 28).

With respect to the alleged "lack of clinical findings," even the state agency physician, Dr. Ruiz, thought that Plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms were substantiated by the objective medical evidence alone and that she

was credible. (Tr. 107). There is ample documentation of clinical findings in extensive medical treatment evidence from Dr. Rahn, Dr. Reecer, and Mallers & Swoverland. These records document abnormal findings related to Plaintiff's lumbar spine, her SI joints, and hip. Like the error in evaluating the SI joint dysfunction on the medical opinion evidence, the ALJ has failed to give appropriate consideration to this impairment as it pertains to the credibility analysis. A lack of medical evidence alone is an insufficient reason to discredit testimony. *Villano v. Astrue*, 56 F. 3d 558, 562-563 (7th Cir. 2009). *See* S.S.R. 96-7p; *Clifford*, 227 F. 3d at 671-672.

The ALJ also claimed that Plaintiff's post-onset work activity "significantly undermines the allegations of the claimant and her husband," yet she failed to consider and connect facts surrounding the work activity to her conclusions. (Tr. 26). Contrary to the ALJ's assertion, the claimant's work activity bolsters rather than detracts from her credibility and demonstrates her willingness and desire to work and substantiates her testimony concerning her symptoms and work-related abilities and limitations. *Jelinek v Astrue*, 662 F. 3d 805, 812-813 (7th Cir. 2011). ("The activities the ALJ mentioned reflected only willingness and ability to stay engaged and commendable but limited endeavors part-time or at her own pace.").

Plaintiff accepted a part-time hearing and vision screening job in August 2014, more than a year after her alleged disability onset in April 2013. She worked only two days per week and ultimately resigned from the job in February 2015 because physical demands significantly increased her pain. (Tr. 322). Dr. Reecer's treatment records from August 2014 also reflect that Plaintiff was experiencing increasing difficulties and that after working 2.5 hours she came home and took two Norco and a Flexeril. (Tr. 722-727).

Plaintiff accepted a different job in December 2014 as a nurse recruiter. The ALJ's

analysis fails to mention a May 2015 letter from Plaintiff's supervisor, Ms. Rey, which supports Plaintiff's reports concerning her symptoms. (Tr. 317-318). Ms. Rey noted that Plaintiff was employed at the same office prior to April 2013 as a private duty nurse and that she was a reliable hard-worker and not the type to complain or give up easily. (Tr. 318). She hired Plaintiff in December 2014 for a part-time nurse recruiter and currently worked about fifteen to seventeen hours per week. (Tr. 317). Ms. Rey noted that for a few months, Plaintiff tried to work more hours, but expressed a marked increase in her pain levels after working longer than five to six hours per day, even with the option to walk around the office and alternate positions from sitting and standing. (Tr. 317-318). Ms. Rey noted that there were quite a few times when Plaintiff had to rearrange her schedule due to pain, sometimes coming in later, or more often leaving earlier than planned. (Tr. 317).  Occasionally, Ms. Rey had to conduct interviews or part of an orientation if Plaintiff was physically unable to do so. (Tr. 318).

The ALJ's failure to mention the evidence from Ms. Rey in the decision is contrary to SSR 06-3p6 and 20 CFR 404.1527f, which indicate that a decision should include a discussion of third-party evidence that may have an effect on the outcome of a case in order to allow a subsequent reviewer to follow the adjudicator's reasoning. The ALJ has also failed to explain how Plaintiff's work detracted from her symptom testimony given the nature of the work. *See Roddy v. Astrue*, 705 F. 3d 631, 638 (7th Cir 2013) ("The fact that Roddy pushed herself to work part-time and maintain some minimal level of financial stability, despite her pain, does not preclude her from establishing that she was disabled").

The ALJ's next reason for finding Plaintiff not fully credible was her "pursuit of a higher education while working part-time during the relevant period." (Tr.28). Contrary to the ALJ's

assertion, the evidence does not confirm that Plaintiff pursed her higher education "while working full-time during the relevant period." Plaintiff completed her online bachelor's degree program through Indiana Wesleyan in July 2014, and she commenced a part-time job in August 2014. (Tr. 52). The ALJ also failed to address Plaintiff's testimony concerning her difficulties completing the program--it took her three years to complete a 15-month program because of her condition and medical leaves of absence. (Tr. 52, 68). Plaintiff also reported that she had great difficulty sitting long enough to complete her papers and that her work was often turned in late. (*Id.*). Her pursuit of higher education reflects her dogged, yet unsuccessful efforts obtain suitable and substantially gainful employment to accommodate her impairments. (Tr.99).

The ALJ's mention of Plaintiff's daily living activities also fails to support the credibility finding. As discussed above, Plaintiff's activities are not inconsistent with the restrictions from her treating doctors, and the activities likewise fail to detract from the credibility of the symptom testimony of Plaintiff and her husband. The ALJ has committed a common legal error by failing to recognize "[t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . . . The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Gentle v. Barnhart*, 430 F.3d 865, 867-68 (7th Cir. 2005). The Seventh Circuit has recognized that even persons who are disabled learn to cope with their impairments. *See Gentle*, 430 F.3d at 867.

The ALJ has also failed to take into account the combined effects of all of Plaintiff's impairments and the progressive worsening of her degenerative condition of the spine. *See Roddy*

at 705 F. 3d at 637. The credible evidence of record shows that Plaintiff has struggled for many years with degenerative changes in her spine and that the pain in her lower back, hips and SI joints have progressed and severely limiting. Plaintiff also has bipolar disorder with sleep difficulties, and it is not apparent that the ALJ considered these factors in evaluating Plaintiff's credibility and assessing her RFC. *See Villano,* 556 F.3d at 563.

The Commissioner recites treatment evidence and a laundry list of activities, including work activity, which the ALJ mentioned and "considered" with regard to the credibility assessment. Defendant's Brief pp. 9-12. The Commissioner does not contend that the ALJ explained how the information detracts from Plaintiff's credibility. Moreover, the ALJ failed to properly consider multiple other important factors detracting from the reliability of her credibility analysis, including e.g., the failure to consider the third-party employer statement from Melanie Rey, R.N., errors in evaluating the severity of the sacroiliac joint dysfunction, omitted consideration of reflex deficits, and failure to consider Dr. Ruiz's opinion that Plaintiff's medically determinable impairments could reasonably be expected to produce her pain and other symptoms and that statements about the intensity, persistence, and functionally limiting effects of the symptoms substantiated by the objective medical evidence alone. (Tr. 16-37, 107, 317-318, 609, 753, 763, 789, 971).

The Commissioner concedes that the ALJ erred in failing to evaluate the third-party employer evidence from Ms. Rey but claims the error is yet another harmless one. Defendant's Brief p. 11-12. The Commissioner's assertion that the error is harmless is not well-supported given that the ALJ thought Plaintiff's work activity "significantly undermines the allegation of the claimant and her husband." (Tr. 26). Ms. Rey's statement fully corroborates the symptom

testimony regarding Plaintiff's need to alternate positions, factors exacerbating her pain, and her limited to sit or stand – even while alternating positions – precluding her from completing an eight-hour workday. (Tr. 317-318).

Contrary to the Commissioner's assertion, the ALJ's credibility determination clearly is not entitled to deference in this case. The ALJ's errors in failing to logically connect the reasons for the credibility assessment to her conclusions and inappropriate selective review of the evidence undermined her findings. The ALJ's errors in reviewing the evidence resulted in an improper evaluation of Plaintiff's subjective complaints, as well as an improper evaluation of the medical opinion evidence, and unsupported RFC assessment. *See Scrogham v. Colvin*, 765 F.3d 685, 698, (7th Cir. 2014). Therefore, a remand is appropriate for a proper consideration of Plaintiff's credibility.

## Conclusion

On the basis of the foregoing, the ALJ's decision is hereby REMANDED for further proceedings consistent with this Opinion and Order.

Entered: October 10, 2017.

s/ William C.  Lee
William C. Lee, Judge
United States District Court